We'll hear the first case on the day calendar for argument, 22-1058, Elizabeth Tepinekis v. Pace University Good afternoon, your honors. May it please the court, my name is Blake Abbott and I represent the appellant in this matter. Your honors, like the D.C. Seventh and Fifth Circuits, this court should reverse the premature dismissal of the appellant's claims for refunds of fees paid for the spring 2020 semester for benefits that were not ultimately delivered. But counsel, you agree that those other circuits don't have New York law by which we are bound, isn't that correct? That's correct, your honor. Can I just check it? Absolutely. However, this court should look at those decisions as convincing upon this court and its ultimate decision because, like New York law, there are similar rules surrounding the relationships between students and universities. For example, in the Seventh Circuit, the Guzman v. Loyola University case ultimately reversed the dismissal for the same types of refunds sought here. They also require a similar requirement that the student identify sufficiently a service for which they are paying for and ultimately not receiving. And here we have done just that and met the New York standard as well. Under New York law, the rights and obligations of implied contracts between students and universities are maintained within the university's bulletins and circulars and publications made available to students. Now, it's important to understand that all of those manifestations made on behalf of the university create the obligations in which the university is obliging itself to perform in exchange for something from the student. Here, the appellant has identified several promises to provide on-campus education. For example, on page 25 of the second amended complaint, there is a clear and unequivocal manifestation on behalf of the university that states that the number one benefit for enrollment in its Westchester campus, the campus that the appellant was enrolled in during the spring 2020 semester, is a state-of-the-art campus and students have access to such a campus. Counsel, I don't want to interrupt your presentation, but has any court in New York found that this is a breach of contract under New York law? Under New York law, yes, there have been courts that have found that similar allegations gave rise to plausible claims for a breach of contract. Which one are the names of the cases? Sure. In Bergeron v. Rochester Institute of Technology, the court applied the same standard, the New York standard that we argued for today, and additionally, Ford v. Rensselaer Polytechnic Institute. There is also a case called Flassner v. Manhattan School of Music that also employed similar standards. Now, the court appropriately applied these standards to its interpretation of plaintiff's payments for mandatory fees. Now, the mandatory fees have descriptions to them that describe benefits that students can expect on campus. And this alone, combined with the other manifestations made on behalf of the university, gave rise to a sufficient claim. However, when it came to the tuition claims, the lower court committed an error when it increased the pleading requirements that students have under New York law. The court made the decision to employ a standard that requires that the student identify a guarantee for exclusively in-person education. However, that is not the standard, and that is where the lower court made an error. The standard here is that the students must simply sufficiently identify specific promises for on-campus services, which we have done. Additionally, the court also committed error at the lower level when it determined that plaintiff's claims for unjust enrichment must also be dismissed as duplicative of the breach of contract claims. Now, the court correctly recognized that when there is an agreement between the parties as to a contractual relationship between them, then unjust enrichment can be dismissed at the pleading stage. However, that is not the case in this one. Obviously, there is a disagreement between the parties as to an on-campus component of the contract. Now- Can I speak for a moment about the claim for meals? Okay. Are you pursuing that claim even though Pace offered a $2,000 refund? And we don't know whether Ms. Tapenakis took that refund, or did she, or where does she stand with that? Now, when it came to the refunds issued by Pace during the spring 2020 semester, the appellant in this matter would have received that credit. However, we are pursuing that claim because the refunds that were issued are insufficient, and we have plausibly pled them as such. For example, the refund that was issued by Pace falls far below the amount of time that was missed from the on-campus experience. But I'm talking about the meals, though. Was it enough to cover the meals that were missed? It would have been the same, Your Honor. It would have been the same computation in the pro rata that was issued as far as the meals. Where did you argue in your brief on the meals? What was the- Well, let me back this up. What was the basis on which the district court ruled against you on meals? It was that you didn't respond to the motion to dismiss, right? That's correct, Your Honor. And I looked at your brief, and you didn't say to us, no, no, I didn't respond. So how do you contest the district court's finding based upon which you lost that claim? Well, Your Honor, we would submit that we take the same position as it came to room and board as it does to meals. Where? At least not- You said you didn't respond. You didn't say, oh, and here's my response on meals, please see, here's my other discussion, and this is why it applies. You said you just didn't respond, right? That is what the lower court found, Your Honor. And did you, is the district court, did it mischaracterize what you said? Your Honor, we would submit that we take the same position as it comes to- No, no, no, no, no, no, no. I'm asking, did the district court mischaracterize what you said in the district court? That's a yes or no question. No, Your Honor. Okay, so then, if the district court was correct that you offered the district court no reason to rule in your favor, how did the district court err in dismissing that claim? Respectfully, Your Honor, we would submit that there was error in that we take the same position as- No, no, no. How did the district court know you were taking that position is my point. Was it supposed to intuit what you were probably thinking about that claim? No, Your Honor. Okay. Let me ask a different question, and this is about the procedural posture that we find ourselves in. And I understand the district court denied leave to replead based on futility, right? But didn't it also add an alternative holding that it's under Rule 16b-4 that you didn't show good cause as to why the new allegations could not have been made in advance of the deadline to amend? That's correct. So I understand, I think, your futility argument saying, no, no, it's not futile because we have a winner of a case. Our complaint absolutely could have survived. Right. I understand how that responds to the futility argument. But how have you responded or how have you argued that the district court's alternative holding was wrong? Because that's another basis. The district court said you're wrong for two reasons. You only win on appeal if you can show both reasons are wrong, right? If a district court dismisses you for two reasons, you have to show both reasons are wrong, right? Well, one of the reasons for dismissal was a failure to satisfy CAPA requirements, subject matter jurisdiction. And another one was dismissal with prejudice under the grounds that we could not amend to meet the standard at which he was employing, which is what we were appealing today. But I thought that the lead to amend was based on two grounds. One was the futility, meaning subject matter jurisdiction and all that. But another one was you failed to satisfy the 16B-4 good cause. In other words, you could have brought these allegations earlier. And it's a timing question, right? Or am I missing? Maybe I'm wrong. But I see that, I think it's footnote three. Is that not what the district court said? Your Honor, I would have, also I've seen that I've gone over my time. Can I answer your question? No, you can, well, with the indulgence of the presider, maybe you could just answer that question. Your Honor, I would like to take an additional look at that and submit additional briefing on that issue. I don't have the answer for you today. Well, I don't know that we need it. I guess we can ask you for it if we need it. Thanks very much. Thank you. Mr. Fellows? Good afternoon. May it please the court. Jonathan Fellows, Bond, Shenick and King for Pace University. Your Honors, as Judge Pooler's question to my opponent made clear, New York law is different than the law that the other circuit courts have applied. New York says there is an implied agreement between the student and the university. But we will only enforce specific promises made in the institution's catalog. And what plaintiff is attempting to do and what the other circuits allowed plaintiffs to do is take every statement, every publication an institution has ever made and say, yeah, yeah, in that one they said we have a great campus. Well, every school says they have a great campus. That isn't a specific promise in the school's catalog. And that is what the New York Court of Appeals and the appellate divisions have repeatedly said is necessary, a specific promise in the document that governs the relationship between the student and the school, the catalog or the bulletin. And this court has followed those holdings in Papalino versus Albany College of Pharmacy and in other cases. And the federal courts have repeatedly followed that. And I would like to note that so Judge Furman decided this case. He decided the Columbia case. Judge McMahon decided the NYU case. Judge Wood decided the Fordham case. Judge Kogan decided the Long Island University case. And some of those cases are here before this court. Counsel, can I ask you? I think I understand those. Can you address, and I'm looking at page six, note three is a reference to opposing counsel of the district court's ruling, which I read as providing an alternative holding for denying leave to amend the complaint. So not only was there the ruling about futility in the text, but there was also this other holding that there was not good cause at this late date to bring these new allegations. It could have found them earlier. I don't think you talked about that in your brief. So could you just address, I guess, number one, did you put it in your brief? Did I miss it? Number two, regardless of whether it's in your brief, is it correct? And would it provide an independent basis for affirmance in your view? To answer your question, we did not argue that in our brief, Your Honor. The reason you're addressing whether it's an alternative cause for the dismissal is because Judge Furman started footnote three with the three words in the alternative. So, yes, it was clearly an alternative ground. And I would say to go through the procedural history of this case, we initially moved under Rule 12 to dismiss this case. Judge Furman denied the motion. We made a motion for reconsideration, and he said, yeah, you've pointed out some new things, but tough luck, go do discovery. We did the discovery, except plaintiff Ms. Marbury, who was then the plaintiff, disappeared. And we couldn't get any discovery from the plaintiff during that time. But we produced multiple witnesses on behalf of Pace.  Then, when they couldn't find Ms. Marbury, they moved to amend and to change their claims. And I believe that at that point in the case, where not only had we gone through a motion, but we had gone through extensive discovery. The whole discovery period had passed. Judge Furman was well within his rights to say too late. And that's what he says in footnote three. Just to be clear, this alternative hold thing only goes to the instructional format claim, right? Correct. That's my understanding of it, Judge. And you would have other arguments, I understand, as to meals and lodging and all that. But you would agree that this only goes to the format of instruction? Because, Your Honor, Judge Furman had dismissed the meals, the room and board claims, in our initial motion. We did win something on the initial one. And it's clear that the reason he dismissed the meal claim, Your Honor, was they didn't oppose our motion. And there's nothing in their brief that says they did. And Judge Furman's a tough judge, but he's also a fair judge. And they didn't oppose that, Your Honor. Counsel, can I ask you to turn to Fletcher versus Manhattan School of Music, which counsel cited to us? There, under New York law, in fact, in 7th District of New York, the judge found that there was an implied contract to provide in-person experiences. How do you square that with this case? I believe in that case, Your Honor, the judge pointed to statements in the catalog that implied that all instruction would be in-person. And in a school of music, Your Honor, it's somewhat different than a liberal arts program as is offered at Pace's Westchester campus. So you think that's enough to distinguish The Manhattan School of Music. Pace from the Manhattan School of Music. Yes, Your Honor. What the New York courts have specifically said over and over again, and the federal courts following the state courts, we're not going to imply things that the parties wouldn't have agreed to in the first place. And I don't want to get away from the first thing we cite in our brief, which is the emergency closings provision in Pace's catalog. And this was an emergency. This court's already said the COVID was an emergency. We closed our campus at Pace because the government declared there was an emergency. And what our emergency closure provision, citing our brief, says is if we have to close our campus due to an emergency, there will not be a refund of tuition and fees. And, Your Honor, what they're basically saying is we want you to imply a promise that's directly contrary to what we put in the catalog. Basically saying Pace can't write a contract the way it wanted. So, it's very clear here, Your Honor, that we put in our catalog that if we have an emergency that forces us to close our campus, which is undeniably what happened. We had to close our campus because the state ordered us to for good reason. But we continued instruction. And tuition, Your Honor, is clearly defined as payment for instruction. And Pace transitioned immediately to remote instruction. All of the professors who the plaintiff had continued to provide instruction at the same times on the same syllabus. There is no allegation in this complaint that instruction did not continue. There is no allegation that credits were not awarded for that instruction. And that's what tuition is for. Payment for instruction. What they want to say, Your Honor, is that tuition is payment for an intrinsic value of an on-campus experience. There's nothing in the catalog of Pace that supports that allegation. And that's what New York courts have said is- Even though they talk about the campus being part of the experience of college and how special the campus is in the heart of New York City, yada, yada. But even though that's still not an implied contract by your lights? No, Your Honor. What would be an express promise? Which is what the courts have required in New York. And yet in Manhattan School of Music, they found an implied promise. Well, I think what Your Honor is saying is what the New York courts have said is there's an implied agreement between a school and the students. But we're only going to enforce specific promises. And again, Your Honor, there's a very different program when it's a music program with instruction in instruments and music than a liberal arts education. And what the courts have said is we want an express promise to enforce. We're not going to go in and second-guess what academic institutions have said. And what Pace said here is instruction can and will continue. You will earn credits for your Pace degree if you intend that remote instruction and do the work. And what the New York Court of Appeals said when it affirmed the first department in Gertler v. Geigold is custom is not something we're going to enforce as a contract. So universities and colleges, and all of us here went to universities and colleges and loved our experience there, are full of customs and traditions. But it's not for the courts to start enforcing which one of those customs and traditions is a contract. Here, what Pace did was continue instruction with the same faculty in the same material. And there's no allegation that that didn't happen. And that's what tuition is for. And to be clear, Judge Furman did not dismiss all the fee claims in this case. What happened is after he dismissed the tuition, the case no longer met the $5 million threshold for CAFA jurisdiction, and we moved to dismiss on that ground. He did not rule on the fees. He only ruled on tuition. Tuition is payment for instruction.  It is not payment for having a nice experience at college. If the courts start to try enforcing a nice experience at college, you will have a lot of cases. Thank you, Your Honors. Mr. Abbott, you have two minutes. May it please the Court. Two points on rebuttal, Your Honors. The first is a response to Apelli's position on the Flatcher case. I find it quite interesting that although they maintain the position that you can only enforce a specific promise found one place in academic catalogs, there is some sort of exception to the Flatcher school. In other words, the Court can look to other circumstances and the relationship between the parties to ensure a mutual assent for a bargain for exchange. Well, counsel attributed to the type of study that music is different than liberal arts. You have to, I guess, be in the room with your music teacher but not necessarily with your sociology teacher. Right. I would say that that is another way of interpreting the relationship between the two parties and ensuring that mutual assent. And that is the goal. At Pace, we can be sure of this mutual assent because there's other opportunities to see how exactly the parties interact with each other. The way that they've been going about business and handling the relationship throughout history, the way that students go about registering for their classes, the way that they select their campus and their room. You can also look for the way that Pace itself markets its own products. It has an online product and it has an on-campus product and it treats them both differently. And as to my second point, Your Honors, as to the disclaimer, the emergency closing disclaimer that Apelli referenced earlier, cases such like this have not seen a disclaimer be dispositive at this point, absent clear and unequivocal force majeure language and allocation of financial risk. Here, we would say that Judge Furman made an appropriate decision in finding that this disclaimer was, at a minimum, ambiguous. Here, it seems to cover temporary changes to instructional offerings for things such as weather or repairs of things that need to be done to the campus. And such incidental changes, Pace has reserved the right to, but not something as significant as a complete departure from the on-campus model it was offering prior to COVID. Thank you. Thank you, Mr. We'll adjourn the decision. And we'll turn to the last argument for today, which is Stark against City of New York. Thank you. Mr. Rickner, you're on. Thank you, Your Honor. Good afternoon, Your Honors. At the outset, I think that it's important to focus on the time of the inquiry with respect to when you decide probable cause should be analyzed.   Devon Peck, 2004 Supreme Court case, says probable cause is determined at the time of arrest. Now, this undermines one of the essential points in defendant's argument, which is that once they have a complaining victim who outlines a crime, that's the end of the inquiry. No additional information must be considered by the arresting officer before making the arrest. That's simply not accurate. There's multiple features to the law, but they're all well-established, measured from the time of the arrest. We look at the totality of the circumstances. There's, I believe the case of Stanwyck, where they talk about you have to look at the whole story just like the whole chapter of a book. There's Singer, which states a complaining witness, and in that case a complaining witness who signed something under oath, is to be believed unless there's evidence that the witness isn't reliable. Counsel, can I ask you to jump ahead? Yes. Because I think I understand your argument that at the time of arrest you have to charge the police officer with everything they knew. What? So if they had just witnessed something that was clearly exculpatory, they can't just pretend they didn't see it. Correct. Let's assume for the sake of argument, I think taking every factual assumption and then some in your favor, let's assume even that the police officer had watched this video. I watched the video. I can't make heads or tails out of it. So seven minutes I won't get back in my life. And even more because I kept replaying the last 30 seconds, so I think it ended up to I don't know how many minutes. It's dark even when you adjust the brightness and everything. You can see that some people are running around a bit. Some things are happening behind a sign that is clearly blocking part of the video, and then the video ends. So you don't know what happened after the video. I don't understand how even if the police officer had seen this video, it could have affected the probable cause of termination in any way, making it better or worse or indifferent. So explain to me what is on that video that I missed. Okay. I understand that it is dark, and I found that on my computer monitor at work I could see it quite readily, and when I turned up the brightness, you can see the outlines of all the different figures. And when you take that in conjunction with what the cop already knew, I think it really calls into question the complaining witness to the point where they're no longer reliable for probable cause. So starting from the beginning, they have the plate number of the quote-unquote perpetrator's car. This is on a police report in GAA-031. They never run the plates on the car. But what's going on? Go to the video. Yes. I'm getting to that. What does that got to do with the video? Yes. The person with the drill, wearing lighter clothing, you can see them set the drill down, is clearly different from the two people who get into the car that are wearing darker, clearly a Hasidic garb. So the car, where he says the perp's car, this is what the complaining victim said, isn't the perp's car. The person with the drill is separate from the two people who get into the car. So that's one way that it. The video tells us who owns the car? Well, it doesn't tell us who owns the car, but you have the alleged. It doesn't show a license plate either, does it? I'm sorry. The video doesn't show a license plate. No, but you can see the alleged victim running up, looking at the license plate from behind the car. But we can't see it from the video, right? You can see somebody running up to behind the car, clearly trying to get a license plate as the car is driving away. Does the video show the license plate? I couldn't make out the license plate, but it does appear. The point of it is, is that the video shows two people who aren't the person with the drill driving away in this car. You're right, Your Honor. You say, well, that doesn't completely extinguish the possibility that the two people got into the car are not, you know, borrowing it from the person with the drill. But they're not the same. But we don't even know who they are. Well, they're the actual assailants. They're the actual vandals, rather. There was no assault shown in the video. And that, I think, gets to my second point, which is you have people from the community coming to the officer saying Mr. Grossman is confused. Right. The officer has no obligation to believe them. We'll take that, right? Under probable cause, you're not going to say that we have to draw all inferences in favor of the subject of the criminal complaint, are you? I'm saying that it all works together in the totality of the circumstances. And here's the point, that you have people coming and saying Grossman is confused. There's no ID procedure. Yes, Grossman shows up and says the person who did it is Moisha Stark, and here's their contact information. We know, taking the inferences in our favor, that there was no ID procedure beforehand, no rudimentary inquiry that says, all right, well, where'd you get this name, Moisha Stark? How'd you get his information? What? Didn't he claim to know it? The officer said he shows up and says the person is Moisha Stark. I have their- The complainant does. The complainant says this is the person. There's no evidence in the record of any further inquiry, and when the person was- Hang on, now you're conflating two things. There's evidence in the record that it was Mr. Stark, and that was the statement by the complainant, right? Right, but- So there's evidence. There's no evidence that who the complainant believes is Mr. Stark is actually the person who did the vandalism. Doesn't he sign the photograph and say that it is the person? After being threatened and taking that into our favor, I don't believe that's a credible identification procedure. In fact, I think it works for us. You have people saying, Mr. Grossman's confused. Mr. Grossman is never given a really rudimentary photo ID. Is this Moisha Stark? We have a photograph of him with his license. Well, you would agree that there's no requirement. There's no probable cause requirement of a photo ID before someone, a police officer, has probable cause to effectuate an arrest, right, in general? Well, in general, yes, but when you have somebody who says, I have this name, I have this identification, and you haven't gone the further step to say, well, wait a minute, I need to know how you know this name you've gotten is actually the person who assaulted you, rather than somebody else saying, oh, yeah, I think that was Moisha Stark who did it. And we know that he did not take any inferences. Is there case law about that? Suggesting that if someone comes forth and says, person X just assaulted me, the police don't have probable cause unless they conduct an independent inquiry to confirm that the person who claims to know who assaulted them really, really knows who this person is? Is there any case suggesting that? I don't know that there's the case that says that directly, but what there is is the case law that says you can accept a complaining witness until there's reason to start questioning whether or not they have the right person. You know, she also never confirms that there's an injury. And I understand your point about the video and that perhaps, you know, they would have looked at it and said, well, this doesn't show me anything at all. I think it's worth mentioning that what the officer actually knew, which is the inquiry at issue here, is that Mr. Finkelstein, former U.S. attorney, experienced defense lawyer, comes in and says I have a video that exonerates my clients. And you have them playing the video in the deposition of Mr. Stark starting on January 1, 1930. But again, we've seen this video. Again, let's even assume in the most beneficial possible set of assumptions in your favor that it was shown and that the officer saw it. I know that's all disputed. Right. I don't understand how I watched it. I don't think it turns anything in favor of your client. Well, if you look at what's in the record, which- Actually, it shows your client was there with the drill. It does. That is true. So he's right at the scene. It does show he was there. And we don't know what happened behind the sign. And we don't know what happened immediately after that video stopped. Right? It seems in the middle of the incident. You see him walking away. But what we do know is that the description provided, and this is in the police report, that essentially Mr. Stark runs over and starts clubbing Mr. Grossman with the drill, that appears nowhere. You don't see the reaction of the people. But, of course, this is just seven minutes out of what everyone else was going on. Just because it doesn't show him doing the act, I don't think that's exoneration. Do you? I do. Because it shows my client arriving and it shows my client leaving the scene. And the evidence, the statement by the complaining victim is, look at this particular place. It all happened right in front of my house. We have the beginning of right in front of my house and the end. Maybe it would have been better to trim it a little bit further. But taking all of the information, Mr. Grossman's statements, all of the different things that the officer said, and saying, you know what, I still have probable cause here. This person is still reliable. The additional information just creates too many questions for probable cause. Thank you, Mr. Leslie, very much. Thank you, Your Honor. You reserve two minutes. I've given you some extra time. I do appreciate that. Ms. Washington. Good afternoon. May it please the Court, Assistant Corporation Counsel Deborah Wassell for the City of New York and Detective Estevez. I just want to very briefly correct the record, Your Honors. It's undisputed that Grossman identified Stark. Stark didn't dispute it below. He doesn't dispute it in his brief here. So to the extent there's an argument that's being made, that the identification was somehow not made in the first two instances, that's raised for the first time here. He described it by name and address. Correct. They knew each other. There's no question that these two knew each other. Stark admits that in his deposition. In any event, as Your Honors have already made clear, this partial video of the events doesn't raise a triable issue of fact. It's not plainly exculpatory. You've watched the video. I watched the video. It is so dark that you can't see. There's not even evidence, let alone exculpatory. It's not evidence of much, Your Honor. And as you pointed out, the only thing it really confirms is that Stark was at the scene and he had the weapon in his hand that he's accused of hitting someone with. So to the extent the video provides any evidence, it's inculpatory rather than exculpatory. So given that evidence, there's nothing that would dissipate probable cause based on the identification given to Detective Estevez at the scene, or rather after the event happened. If there are any other questions from the bench, I'm happy to answer them. You don't think that the police officer could have poured some oil on troubled waters by looking at the film? I mean, she could have looked at it. She's not required to. That's your argument. She's not required to. Under the circumstances that we're under, obviously on summary judgment we have to take Stark's account as true that he did offer the video to her. Obviously she says that she was never shown a video, but accepting is true that statement that she was offered the video and didn't watch it. At that point in the case where the victim had identified the perpetrator to her, said, this is the guy, here's his name, his address, his contact information, that's probable cause right there, and she's not under any obligation to investigate further. And, in fact, this video was not, as I've mentioned, is not plainly exculpatory on its face. It would have required the detective to go out and perhaps obtain the rest of it or authenticate it in some way because it's not even clear what you're looking at from that video, which, as Stark says in the deposition, was shown on the lawyer's cell phone. So if none of us could see what was going on on a large computer screen, it's hard to imagine how she would have been able to see anything on a cell phone screen. If the court has no further questions, the city will rely on its briefing. No further questions? Mr. Wigner, you've got two minutes. Two things briefly. One, we're not suggesting only that they reviewed the video but also that they would have talked to Mr. Finkelstein who could have run through what the video showed. We had defense counsel right there that the detective refused to We don't deny what counsel just said, that they had an ID from the victim, he identified the perp, and they had probable cause. Is that correct? Absent other factors, I'll acknowledge, yes, it's correct, but this is the clause So unless you have probable cause, how much further do you have to do? I have to believe this wasn't the only item on Sergeant Estevez's desk at the time. How much more investigation does she have to do? Well, I think the answer is rudimentary. That's what Hernandez said. She had ID. Didn't she have ID? That's true, but in Singer it says unless there's reasons to believe that this may not be accurate. In the totality of the circumstances, I believe there are. And also I think it's worth mentioning when you're talking about Fourth Amendment reasonableness, just saying a cop is so busy that they get to handcuff somebody is a pretty big deal. The existing standard here is very deferential to the police. This is, I'd say, one step too far, which is to say, look, you don't have to do a lot of investigation under the Fourth Amendment, but it's a reasonableness standard, and you should really do some police work to avoid my client spending the night in jail, which maybe some people believe isn't a particularly big deal. This was his first arrest, and it was really meaningful for him. He filed a federal civil rights lawsuit. So, you know, maybe you do a little more, and I don't think it's unfair or against the case law to look at these facts and say this is a case where you do a little more. Thanks, Mr. Rickman, very much. We'll adjourn the decision, and we are adjourned. Thank you.